## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WAUSAU UNDERWRITERS INSURANCE COMPANY, a Wisconsin company, and EMPLOYERS INSURANCE COMPANY OF WAUSAU, a Wisconsin company, | |
| Plaintiffs, | Case No. 17-cv-5952 |
| v. | Judge Mary M. Rowland |
| THE CINCINNATI INSURANCE COMPANY, an Ohio company, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This is an insurance coverage dispute arising out of a personal injury case brought against Vita Food Products, Inc. by an employee of Painters USA, Inc. The employee was seriously injured while working at a Vita Food facility in Chicago and brought a negligence action in state court against Vita Food. After trial, a jury reached a verdict in favor of the employee. Plaintiff insurance companies in this case paid the $8.96 million judgment on behalf of Vita Food. Plaintiffs filed this lawsuit seeking a declaratory judgment that Defendant Cincinnati Insurance Company is liable to contribute its share of the judgment. Parties have filed cross motions for summary judgment.

For the reasons stated below, Plaintiffs' motion for summary judgment [36] is denied and Cincinnati's motion for summary judgment [43] is granted.

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). In doing so, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

When cross-motions for summary judgment are filed, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion

was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chi.*, 657 F.3d 433, 439 (7th Cir. 2011). *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## BACKGROUND[1]

### I.  Underlying Action

In early 2011, Vita Food's Maintenance Manager Martin Morse ("Morse") contacted Painters USA, Inc. ("Painters") to obtain a bid for a painting project planned for the Vita Food Facility in Chicago. (PSOF ¶ 8).[2] Painters' Vice President, Paul Cook ("Cook"), visited the facility and sent a proposal for the work. (PSOF ¶ 9). After work was underway, on June 30, 2011, Painters' employee, Nardo Ovando ("Ovando"), was injured in an accident at the Vita Food Facility and experienced a traumatic brain injury ("Ovando Accident"). (PSOF ¶28; DSOF ¶21). Ovando and his wife sued Vita Food in the Circuit Court of Cook County (the "Underlying Action").

---

[1] The facts in this Background section are undisputed unless otherwise noted. Plaintiffs' Rule 56.1 Statement of Facts (Dkt. 38) is abbreviated as "PSOF". Defendant's Rule 56.1 Statement of Facts (Dkt. 45) is abbreviated as "DSOF". Defendant responded to Plaintiffs' Statement of Facts and provided a Statement of Additional Facts in Dkt. 51. Plaintiffs responded to Defendant's Statement of Facts and provided a Statement of Additional Facts in Dkt. 49. Plaintiffs responded to Defendant's Statement of Additional Facts at Dkt. 55.

[2] This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000. (PSOF ¶4). It is also undisputed that Illinois law applies. (*Id.* ¶6). In addition, Illinois National Insurance Company was terminated as a defendant on October 25, 2018. (Dkt. 31).

At trial, Ovando alleged a negligence claim and sought damages from Vita Food for his injuries, pain and suffering, and for medical care and services. His wife brought a loss of consortium claim. (PSOF ¶32). When the complaint was filed against it, Vita Food demanded insurance coverage (defense and indemnity) from Cincinnati as an additional insured under the commercial package insurance policy Cincinnati issued to Painters. (PSOF ¶33). Cincinnati initially refused to defend or indemnify Vita Food. (PSOF ¶34).

In February 2017, a jury returned a verdict in favor of Ovando and his wife and against Vita Food. (PSOF ¶36). On February 9, 2017, a money judgment was entered against Vita Food for $8.96 million. (PSOF ¶37). Cincinnati has not paid any part of that judgment. (PSOF ¶39).

## II. Parties and Policies

Plaintiffs Wausau Underwriters Insurance Company ("Wausau") and Employers Insurance Company of Wausau ("Employers") are Wisconsin corporations with their principal places of business in Boston, Massachusetts. (PSOF ¶¶1-2). Defendant Cincinnati Insurance Company ("Cincinnati") is an insurance company organized and existing under the laws of the state of Ohio, with its principal place of business in Fairfield, Ohio. (PSOF ¶3).

Cincinnati issued Policy No. EPP 000 91 32 to Painters for the policy period of January 15, 2011 to January 15, 2012 (the "Cincinnati Policy"). (PSOF ¶ 19). The Cincinnati Policy contains Commercial General Liability ("CGL") and Commercial Umbrella/Excess Liability. (PSOF ¶20). The CGL coverage part of the Cincinnati

4

Policy provides primary-level coverage with limits of liability of $1,000,000 per occurrence subject to a $2,000,000 general aggregate and a $2,000,000 products-completed operations aggregate. (*Id*.). The Cincinnati Policy contains an endorsement regarding coverage afforded to additional insureds. (DSOF ¶13).

Vita Food's only means to seek coverage under the Cincinnati Policy, as provided by the Additional Insured Endorsement, is to demonstrate that an agreement or contract was entered into between Painters and Vita Food requiring such insurance coverage. (DSOF ¶17). The terms of the Cincinnati Policy require that the contract or agreement, whether oral or written, requiring additional insured coverage be in effect and that it be executed prior to the "occurrence" for which coverage is sought. (DSOF ¶19). The Certificate of Insurance, which lists Vita Food as the Certificate Holder, was issued July 1, 2011, the day after the Ovando Accident. (DSOF ¶24).

Wausau issued to Vita Food a CGL policy, Policy No. TBJ-Z91-449649-031, with a policy period of June 19, 2011 to June 19, 2012 (the "Wausau Policy"). The Wausau Policy provides CGL coverage with limits of liability of $1,000,000 per occurrence subject to a $2,000,000 general aggregate and a $2,000,000 products-completed operations aggregate. (PSOF ¶23). Employers issued to Vita Food a commercial umbrella policy, Policy No. THC-Z91-449649-041, with a policy period of June 19, 2011 to June 19, 2012 (the "Employers Policy"). The Employers Policy provides umbrella liability coverage with limits of liability of $10,000,000 per occurrence subject to a $10,000,000 aggregate. (PSOF ¶24).

### III.     Cincinnati's Declaratory Judgment Action, Seventh Circuit Decision, and Settlement

On July 19, 2013, Cincinnati filed a declaratory judgment action, *Cincinnati Insurance Co. v. Vita Food Products, Inc.*, No. 1:13-cv-5181, N.D. Ill., seeking a declaration that it did not owe coverage to Vita Food under the policy it issued to Painters. (PSOF ¶40). The District Court granted summary judgment in favor of Cincinnati (2015 U.S. Dist. LEXIS 11521 (N.D. Ill. Jan. 30, 2015)) but on appeal, the Seventh Circuit reversed and remanded the case for further proceedings (808 F.3d 702). (PSOF ¶42). The Seventh Circuit held that "if Vita can prove that there was an oral agreement to add it as an additional insured prior to the accident in Ovando, it will be entitled to coverage under Cincinnati Insurance's policy." (DSOF ¶42).

Following the Seventh Circuit decision, Vita Food and Cincinnati agreed to settle the duty to defend claim and Cincinnati agreed to pay a portion of Vita Food's defense costs in the Underlying Action. (PSOF ¶43). Cincinnati and Vita Food reached this agreement in 2016 subject to a reservation of rights with respect to possible indemnity coverage. (DSOF ¶43).[3] The parties dispute whether Vita Food and Cincinnati later reached an oral settlement agreement in January 2017 to settle Vita Food's claim that it was an additional insured and was owed indemnity coverage by Cincinnati under the Cincinnati Policy. After the jury verdict in the Underlying

---

[3] Given the reversal by the Seventh Circuit and subsequent dismissal without prejudice by the district court, there has been no ruling about whether Cincinnati owes Vita Food a duty to indemnify. *See* PSOF ¶44. (Vita Food and Cincinnati settled the duty to defend claim. *Id*. ¶43.)

Action, Cincinnati sent a settlement check to Vita Food on February 15, 2017 but Vita Food did not cash it. (PSOF ¶54).

## ANALYSIS

### I. Parties' Summary Judgment Motions

Plaintiffs argue that because they paid the entirety of the $8.96 million judgment in the Underlying Action on Vita Food's behalf, Vita Food's rights to recover from Cincinnati under its policy, in full or partial satisfaction of the judgment, are transferred to Plaintiffs. (Dkt. 37 at 12). They request judgment on all counts against Cincinnati: (1) Count I (Declaratory Judgment as to Cincinnati CGL Coverage); (2) Count II (Declaratory Judgment as to Cincinnati Commercial Umbrella/Excess Liability Coverage); (3) Count IV (Equitable Contribution); and, in the alternative, (4) Count V (Equitable Subrogation). Plaintiffs also request summary judgment in their favor on Cincinnati's fifth affirmative defense (prior settlement). (*Id*. at 7).[4] In its motion, Cincinnati argues that it is entitled to summary judgment because Vita Food was not an additional insured on its policy and because it had an oral settlement agreement with Vita Food, and therefore it owes no sums to Plaintiffs based on their claims of equitable contribution and equitable subrogation. (Dkt. 44).[5]

---

[4] Cincinnati's fifth affirmative defense states: "Plaintiffs' claims against Cincinnati are barred pursuant to the agreement between Cincinnati and Vita Food with respect to the resolution of Vita Food's request for insurance coverage in return for the payment of $500,000 toward the amount paid to satisfy the judgment in the Underlying Action." (Dkt. 20 at 38).

[5] Cincinnati's request for oral argument on the motions (Dkt. 43) is denied.

The parties' cross motions involve two main disputes: (1) whether Painters and Vita Food reached an oral agreement in Spring 2011 to add Vita Food as an additional insured to Painters' insurance policy with Cincinnati; and (2) whether Cincinnati and Vita Food reached an oral settlement agreement in January 2017 to settle Vita Food's coverage claim against Cincinnati.

## II.    Oral Agreement to Provide Indemnification Coverage

In *Cincinnati Ins. Co. v. Vita Food Prods.*, the Seventh Circuit held that "if Vita can prove that there was an oral agreement to add it as an additional insured prior to the accident to Ovando, it will be entitled to coverage under Cincinnati Insurance's policy." 808 F.3d 702, 705 (7th Cir. 2015). Plaintiffs here, Vita Food's insurers, argue that it is an undisputed fact that Vita Food and Painters made that oral agreement and therefore Cincinnati must pay its portion of the judgment from the Ovando Lawsuit. However neither party has met their burden to show that summary judgment on the issue is warranted. There is a genuine issue of fact whether Painters and Vita Food had an oral agreement to add Vita Food as an additional insured to the Cincinnati Policy.

In Illinois, an oral agreement is binding "so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement." *Ins. Ben. Grp., Inc. v. Guarantee Tr. Life Ins. Co.*, 2017 IL App (1st) 162808, ¶ 46, 91 N.E.3d 950, 964 (2017) (citation and quotations omitted). "The existence of an oral contract, its terms, and the intent of the parties is a question of fact...It may become a question of law, however, if the facts are undisputed and there can be no difference in the judgment

8

of reasonable men as to the inferences to be drawn from them." *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 369 (7th Cir. 1998) (citation and quotations omitted).

The only two individuals involved in the alleged oral contract were Vita Food's Maintenance Manager Morse and Painters' Vice President Cook. (Dkt. 37 at 14). Morse and Cook were both deposed in 2014 and again in 2018, and Morse also provided a declaration in 2014. (Cook 2014 Dep. (Dkt. 45-3); Cook 2018 Dep. (Dkt. 45-8); Morse 2014 Dep. (Dkt. 45-2); Morse 2018 Dep. (Dkt. 45-7); Morse Decl. (Dkt. 38-1)). A review of the depositions and Morse's declaration does not support Plaintiffs' contention that Morse had a "clear recollection of the oral contract." (Dkt. 37 at 15). Instead the testimony shows Morse's and Cook's different accounts of their discussions about insurance. The question comes down to one of credibility.

Morse's 2014 deposition provides few details about the alleged oral contract. The extent of the information about the alleged oral contract is from this exchange:

Q:[Y]ou indicated that you've had some conversations about this oral agreement with Mr.—you had some agreement with Mr. Cook regarding seeking additional insured coverage, correct?

A: Yes.

(Morse 2014 Dep. p. 24). In his 2018 deposition, Morse provided some additional information, but that information conflicts with his 2014 declaration. In his 2018 deposition, Morse was asked when he made the request to Cook for Vita Food to be named as an additional insured. He did not give any time frame, but responded that it was when Cook came into the Vita Food facility: he "brought a guy in, his supervisor, that was going to run the job. And we went over the areas to be painted I

9

think at that time." (Morse 2018 Dep. pp. 31-32). In Morse's 2014 declaration however, he states that in April or May 2011, he "called Mr. Cook to discuss the terms…of a potential agreement…[and] told Mr. Cook that Vita needed to be an additional insured under Painter's policy of insurance." (Morse Decl. ¶4).

As to Cook's testimony, Plaintiffs argue that he did not dispute the existence of an oral agreement, "only that he did not recall its specifics." (Dkt. 37 at 14). That mischaracterizes Cook's testimony. He did not concede that he agreed to add Vita Food as an additional insured on the Cincinnati Policy. During his 2014 deposition, when asked if "prior to doing any work for Vita, Painters agreed to provide insurance coverage for Vita in connection with Painters' work," Cook responded "yes". (Cook 2014 Dep. p. 24). But during that same deposition, when asked if he "believe[d] that Painters had done everything it would have needed to do to ensure that Vita would have been an additional insured under Painters' insurance…" Cook responded, "I don't know that we were asked. We don't do that unless we're asked for additional insured." (*Id.* at p. 28). In his 2018 deposition, when asked, "what did Painters do to make sure that Vita would be added as an additional insured on the Cincinnati policy prior to beginning work?" Cook responded, "[W]e weren't asked to." (Cook 2018 Dep. p. 24). Plaintiffs stress that in 2014 in response to the question, "Mr. [Morse] communicated to you…that it was important that Vita be covered by Painter's insurance coverage, correct?", Cook responded he "may have." (Cook 2014 Dep. at p 27; Dkt. 37 at 14). At best this shows Morse made that statement. It does not show

that Cook and Morse had a meeting of the minds about Vita Food being an additional insured on Painter's policy.

This is not a case where Morse recalled specific facts about an oral agreement that Cook did not remember. Cook's testimony shows he recalled discussing with Morse that Painter's had insurance coverage, but Cook's recollection was Painters was not asked to add Vita Food on the Cincinnati Policy as an additional insured. (Cook 2018 Dep. pp. 24, 46-48).[6]

Just as Plaintiffs failed to show there is no genuine dispute that an oral agreement existed, Cincinnati has failed to show there is no genuine dispute that an oral agreement did not exist. The Court does not agree with Cincinnati that it is "clear" from Morse's and Cook's testimonies that there was no such agreement. (Dkt. 44 at 9). As Cincinnati acknowledges, Morse's and Cook's sworn testimonies about their discussions are contradictory. (*Id.* at 10). That means there is a genuine issue for a jury to decide. As to Cincinnati's argument that the certificate of insurance was issued the day after the accident (*id.* at 10), the Seventh Circuit has already rejected that argument. *Cincinnati Ins. Co.*, 808 F.3d at 705 ("Cincinnati Insurance calls [the certificate of insurance] a precondition to insuring Vita against liability for the accident to Ovando….But the language of the certificate indicates that it isn't a precondition to anything; it's just information.").

---

[6] In 2014, Cook was asked whether he agreed to add Vita Food as an additional insured and responded by saying, "I don't know that we were asked", and in 2018, he responded by saying, "we weren't asked to." Whether Cook's change in testimony calls into question his credibility is a question for the jury. *Mullin,* 732 F.3d at 778-79.

Therefore, weighing the witnesses' credibility and their accounts of their discussions about insurance are questions for a jury. *See Mullin v. Temco Mach., Inc.,* 732 F.3d 772, 778-79 (7th Cir. 2013) (credibility issues should be resolved by a jury, not at summary judgment).[7]

Although this Court has found that there is a genuine issue of fact about whether Vita Food and Painters orally agreed to add Vita Food as an "additional insured" on the Cincinnati Policy, Cincinnati is entitled to judgment as a matter of law because, as discussed below, the evidence shows that it reached a settlement with Vita Food to release Vita Food's duty to indemnify claim.

### III.    Oral Settlement Agreement

#### A. Cincinnati Argues that it Reached a Settlement with Vita Food

In its summary judgment motion, Cincinnati argues that it reached an oral settlement agreement with Vita Food on January 25, 2017 to pay $500,000 in exchange for Vita Food releasing its claim that Cincinnati had a duty to indemnify it under Cincinnati's policy issued to Painters. (Dkt. 44 at 5-6, 13).

"Illinois encourages the settlement of claims and, to that end, settlement agreements may be oral." *Kim v. Alvey, Inc.,* 322 Ill. App. 3d 657, 669, 749 N.E.2d 368, 378 (2001); *Reiter v. Sears, Roebuck & Co.,* 1995 U.S. Dist. LEXIS 13330, at *4-5 (N.D. Ill. Sep. 11, 1995) ("settlement of claims is encouraged as a matter of public

---

[7] Indeed, in *Cincinnati Ins. Co. v. Vita Food Prods,* based on Morse's and Cook's 2014 testimonies the district court found the alleged oral agreement demonstrated "a textbook example of a question of fact for a jury, as arbiter of credibility, to resolve." 2015 U.S. Dist. LEXIS 11521. The Seventh Circuit agreed that there was conflicting evidence "and the district judge therefore correctly ruled that the issue could not be resolved on a motion for summary judgment." 808 F.3d at 704.

policy [in Illinois], and settlement agreements need not be in writing."). "Oral settlement agreements are enforceable under Illinois law if there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement. The essential terms must be definite and certain so that a court can ascertain the parties' agreement from the stated terms and provisions." *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007) (internal citations and quotations omitted). Further, whether there was a "meeting of the minds" "depends on the parties' objective conduct, not their subjective beliefs." *Id.* "An oral settlement agreement is enforceable absent fraud, mistake, or duress." *McDonald v. Topolski*, 2017 IL App (1st) 170342-U, ¶ 23 (2017). Plaintiffs do not raise fraud, mistake, or duress, only that Vita Food and Cincinnati did not reach a settlement agreement in January 2017.

The following relevant facts are undisputed: the morning of January 25, 2017 (while the trial in the Underlying Action was ongoing), counsel for Vita Food, Steven Blonder ("Blonder"), contacted counsel for Cincinnati, Brian Reid ("Reid"), regarding settlement of Vita Food's claim for coverage from Cincinnati. (DSOF ¶45; Dkt. 49 ¶45).[8] That morning Reid and Blonder had two conversations; only Reid and Blonder

---

[8] Local Rule 56.1(b)(3) requires a concise response to a movant's statement of facts and "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiffs' response to DSOF ¶45 states: "[u]ndisputed that Steven Blonder, counsel for Vita Food, and Brian Reid, counsel for Cincinnati, had two phone calls on January 25, 2017." Plaintiffs did not disagree with Cincinnati's statement in paragraph 45 or cite any evidence contradicting the statement. That statement of fact is therefore deemed admitted. *See* Local Rule 56.1(b)(3)(C) and FRCP 56(e)(2) (if a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion.").

were on those calls. (*Id.*; *see also* PSOF ¶45; Dkt. 37 at 17-18). After the jury verdict in the Underlying Action, Cincinnati sent Vita Food a $500,000 check but Vita Food returned the check uncashed. (DSOF ¶¶50-51).

As evidence of the oral agreement, Cincinnati provided the sworn declaration of its counsel, Reid. In his declaration, Reid stated that the morning of January 25, 2017, "counsel for Vita Food communicated a settlement demand to me in my capacity as counsel for Cincinnati, stating that if Cincinnati would agree to pay $500,000 toward the settlement being negotiated with respect to the Ovando Lawsuit, Vita Food would release its claim against Cincinnati with respect to indemnity against any settlement or judgment reached in the Ovando Lawsuit." (Reid Decl. (Dkt. 45-15) ¶4). After consulting with his client, he contacted Vita Food's counsel and "confirmed Cincinnati's agreement to settle the disputed coverage claim based on the terms stated by Vita Food."(*Id.* ¶5). Reid's letter to Blonder on February 15, 2017 reiterated the agreed-upon terms and sent Vita Food a $500,000 check. (*Id.*, Exh. A).

Reid's sworn deposition testimony is consistent with his declaration. He testified that Blonder emailed him on January 25, 2017 asking Reid to call him "ASAP" and during the call, Blonder requested that "Cincinnati increase its settlement offer (to $500,000) in return for a release of Vita Food's insurance claim as their additional insured." (Reid Dep. (Dkt. 38-3) p.18). Reid testified that regardless of what happened with the high/low agreement being negotiated with regard to the Underlying Action, Blonder told him that $500,000 would be "all that Vita Food ever seeks from Cincinnati and resolves the claim." (*Id.* p.19). After talking to Cincinnati, Reid called

Blonder back and said Cincinnati "will agree to resolve the pending coverage dispute and meet...the $500,000 demand in return for the release promised by Vita Food." (*Id*. p.22).

Thus Reid's sworn declaration and deposition testimony establishes that Vita Food made an offer, Cincinnati accepted the offer, and they had a meeting of the minds as to the essential terms of the agreement: Vita Food would release its claim that it was an additional insured under the Cincinnati Policy in exchange for Cincinnati paying Vita Food $500,000.

### B. Plaintiffs' Response

Plaintiffs dispute there was an oral settlement agreement based on: (1) Reid's testimony about a third call on January 25, 2017 with Blonder and Plaintiffs' claims handler, Brian Diericks; (2) Diericks' declaration; and (3) Blonder's March 17, 2017 letter to Reid. (Dkt. 49).

As to Reid's deposition testimony, he acknowledged that he had a third call on January 25, 2017, this time with both Blonder and Diericks. Plaintiffs cite Reid's testimony to support their statement that "Diericks explicitly stated that Plaintiffs would not accept Cincinnati's settlement offer of $500,000." (Dkt. 49 ¶46; PSOF ¶46, citing Reid Dep. 24:6–21). However, that is a mischaracterization of the testimony. Reid testified that Diericks "basically said Cincinnati can't pay 500,000; they must pay 1,000,000, something to that effect," and he interpreted that as Diericks attempting to repudiate the settlement Cincinnati and Vita Food had already reached. (Reid Dep. 24:6–21).

Plaintiffs also rely on Diericks' declaration. (Dkt. 40 (Diericks Decl.)). Diericks is a Senior Technical Claims Specialist at Liberty Mutual Insurance, whose member companies include Wausau and Employers. (*Id.*). Diericks stated that on January 27, 2017, Ovando, Baez, Vita Food, Wausau, and Employers reached a high/low agreement and "kept open the possibility of contribution from Cincinnati to that agreement." (*Id.* ¶4). He further testified about conversations he had with Reid on January 30 and 31, 2017. (*Id.* ¶¶6-7).[9] Diericks' declaration does not address the two phone calls between Reid and Blonder on January 25 (nor could it since Diericks was not on those calls). Notably, Diericks also does not provide any testimony about what was said on the third phone call on January 25, when Plaintiffs claim Diericks "explicitly" rejected Cincinnati's settlement "offer." (PSOF ¶46). (His claims notes attached as Exhibit A to his declaration also do not contain any notes for January 25,

---

[9] In his declaration, Diericks states: "On January 31, 2017, I received a return call from Mr. Reid reiterating Cincinnati's offer from the prior week: that Cincinnati would pay a lump sum of $500,000 toward the high-low agreement to resolve any and all coverage claims against Painters. [] I never agreed to or accepted this offer." (Diericks Decl. ¶7). First, Diericks' declaration contains no testimony about the January 25th calls or about any other discussions he had with Reid "the prior week." To the extent Diericks refers to the January 25th calls between Reid and Blonder, it is undisputed he was not a party to those calls so he would not have personal knowledge of the content of those calls. *See Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement [in Rule 56]"). Second, as discussed in Section IV, *infra*, Plaintiffs have failed to show that Vita Food did not have the authority to settle with Cincinnati at that time without Plaintiffs' or (apparently by extension) Diericks' approval. Therefore, the Court finds that Diericks' statement about his January 31st conversation with Reid does not raise a genuine factual issue about whether *Vita Food* and *Cincinnati* reached a settlement on January 25th.

2017).[10] Thus Diericks' declaration does not create a genuine issue of material fact about whether Reid and Blonder entered into an oral agreement on behalf of *their* clients on January 25, 2017.

Finally, Plaintiffs rely on Blonder's March 17, 2017 letter to Reid. (Diericks Decl., Exh. D "Blonder Letter"). In that letter, Blonder rejected the contention that "Vita, Liberty Mutual and Cincinnati reached a 'settlement agreement' on January 25, 2017." The letter explained that "[w]e specifically discussed that there was never an agreement, a point which was reaffirmed during your communications with Brian Diericks from Liberty Mutual that day and throughout the Ovando trial. As you are well aware, your $500,000 offer was rejected at the time and that rejection continues today."

The Blonder Letter, arguably hearsay, contains conclusory statements and lacks specific facts. It does not provide a basis for the Court to find that the conduct and statements described in Reid's testimony are disputed. First, the Blonder Letter refers to an attempted settlement agreement other than the one Reid testified about and referenced in his February 15 letter—Blonder refers an alleged settlement between Vita, Liberty Mutual and Cincinnati (not Vita Food and Cincinnati only). Second, Blonder's letter does not make clear who "we" is ("we specifically

---

[10] Diericks' declaration also attaches the February 1, 2017 written agreement between Ovando and his wife on one hand and Vita Food, Wausau and Employers on the other. Plaintiffs admit that Cincinnati is not a party to the February 1, 2017 written agreement (Dkt. 48 at 14). As discussed, there is no evidence that the Cincinnati-Vita Food oral settlement agreement was conditioned on entering into a written contract. Furthermore, even if there was evidence that Cincinnati and Vita Food anticipated a formal written document, that "does not preclude enforcement of a specific preliminary promise." *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992).

17

discussed…"), especially given that in the sentence before Blonder refers to Vita, Liberty Mutual and Cincinnati. And it is not clear when the referenced discussion occurred. Although Blonder generally states that there was "never an agreement" and "your $500,000 offer was rejected at the time" his letter does not provide specific facts about what was said during the January 25, 2017 conversations. In contrast to Reid's sworn declaration and deposition testimony recounting specific facts about what happened and was said by Reid and Blonder, Blonder's (unsworn) conclusory statements do not create a genuine issue of material fact about whether Reid and Blonder entered into an oral agreement on behalf of their clients the morning of January 25, 2017. *See Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (the court's assessment of whether there was a meeting of the minds is objective and depends on "what the parties expressed to each other."); *Dillard*, 483 F.3d at 507 (courts assess parties' objective conduct, not their subjective beliefs).

Also in response to Cincinnati's summary judgment motion, Plaintiffs make conclusory arguments unsupported by evidence. For example Plaintiffs argue:

- "As a practical matter, Vita Food would have had no incentive to settle its claim against Cincinnati without Plaintiffs' participation, given that it potentially faced millions of dollars of liability in the Underlying Action." (Dkt. 48 at 13).

- "The circumstances by which Reid sent the check (i.e., the day after the $8.96 million verdict and before any written agreement or release was signed or ever even negotiated) further underscore that Reid and Cincinnati plainly knew that no settlement had been reached." (*Id*. at 15).

- "Cincinnati's blatant eagerness to settle its claim for $500,000 provides additional support that even Cincinnati (and its attorney, Reid) was well aware of its obligation to pay its full $3 million limits." (*Id*. at 16).

These arguments do not defeat summary judgment. *See Daugherty v. Harrington*, 906 F.3d 606, 611 (7th Cir. 2018) ("conclusory statements not grounded in specific facts are not enough" to avoid summary judgment) (citations and quotations omitted); *Bordelon v. Bd. of Educ.*, 811 F.3d 984, 989 (7th Cir. 2016) (same). Indeed the argument, for example, about Vita Food's incentive as a practical matter, asks the Court to speculate about Vita Food's state of mind on January 25, 2017. That is not a proper consideration under Illinois law when determining whether an agreement was reached when deciding if summary judgment is warranted. *See Laserage Tech. Corp.*, 972 F.2d at 802. *See also Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) ("our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture").

To argue that an oral contract was not formed, Plaintiffs also argue that Vita Food and Cincinnati had material terms still to be worked out and they did not execute a written agreement or release. These arguments are not convincing. Plaintiffs argue that "[a]t minimum, the record shows that the parties undoubtedly contemplated further negotiations as to material terms," but do not cite any part of the record in support. (Dkt. 48 at 15). Nor do they identify what material terms were left to be determined. Reid's testimony shows that the terms of the agreement were simple: Vita Food would release its claim that it was an additional insured under the Cincinnati Policy and Cincinnati would pay Vita Food $500,000 in return.

Plaintiffs assert that Reid "could not possibly have reasonably understood or intended for Cincinnati to have settled its claim when Cincinnati had no written

releases from Vita Food or Plaintiffs." (Dkt. 48 at 16). In addition to the fact that this is conjecture, Plaintiffs fail to provide any evidence that a condition of the oral contract was the execution of a written one. *See Love v. Ill. Bell & IBEW, Local 21*, 210 F. App'x 516, 518 (7th Cir. 2006) (an oral agreement is enforceable "even if the parties expect to later reduce it to writing--unless a party conditions its acceptance on the execution of a written agreement."); *see also McDonald*, 2017 IL App (1st) 170342-U, ¶ 28 (language of oral release sufficiently definite to be enforceable).

Moreover, it may be that Vita Food reassessed its agreement after the verdict in the Ovando trial, but "it is well-established that 'a party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement insufficient.'" *Cotton v. Adams*, 2017 U.S. Dist. LEXIS 35844, at *7 (N.D. Ill. Mar. 14, 2017) (*quoting Glass v. Rock Island Ref. Corp.*, 788 F.2d 450, 454 (7th Cir. 1986)). Indeed Plaintiffs focus on events *after* the two calls between Reid and Blonder on January 25, 2017 (Dkt. 48 at 13 and Diericks Decl.) but do not explain how this shows that the oral agreement was not formed. *See Elustra v. Mineo*, 595 F.3d 699, 709 (7th Cir. 2010) ("Post-acceptance conduct does not retract an earlier acceptance.").

Finally, Plaintiffs stress that "Cincinnati chose not to depose Blonder or Diericks in this case." (Dkt. 48 at 13). But in moving for summary judgment, Cincinnati has provided evidence that it reached an oral settlement agreement with Vita Food in the form of Reid's sworn declaration and deposition testimony. The burden thus shifts to Plaintiffs to provide evidence of specific facts creating a genuine dispute about whether such an agreement was reached. Plaintiffs have not done so.

### C. The Case Law Cited by Plaintiffs is Distinguishable

Plaintiffs rely on case law that is distinguishable. *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385 (7th Cir. 1999), did not involve an oral settlement agreement. There the attorneys exchanged written letters attaching draft settlement proposals, and during extensive negotiations, Abbott's counsel explicitly left open to negotiation a material term. *Id.* at 388. The Seventh Circuit noted that the "settlement that Alpha and Abbott were trying to hammer out was a complicated, long-term arrangement involving huge sums of money," and held that there was no binding settlement because "[a]greement 'in general' with a clear contemplation that further negotiations as to material terms will be required is simply not enough to form ties that bind." *Id.* at 389. As discussed, here the terms of the Cincinnati-Vita Food settlement agreement were straightforward, and Plaintiffs have not identified any evidence showing material terms were left to be negotiated.

In *Tindall Corp. v. Mondelez Int'l, Inc.*, 248 F. Supp. 3d 895 (N.D. Ill. 2017), the Court had to determine whether the parties intended to reduce their oral agreement to a written one and whether their emails formed a binding contract. The Court analyzed multiple factors including the multiple meetings showing "two parties continuing to negotiate a complex contract" and an email explicitly stating that there were additional terms to be worked out. *Id.* at 907. The Court also found that one party's statement in an email, "I am ok with what you have detailed below with the following comments," followed by two requests for more information and two comments was not an objective manifestation of acceptance. Here Plaintiffs do not

point to any evidence that there were conditions attached to the oral agreement, a request for a written agreement or other conditions. They also do not provide any evidence of statements that additional terms needed to be worked out or requests for more information during the calls between Reid and Blonder.

In *People ex rel. Skinner v. Caudill Rowlett Scott,* the Court found that the letter from one attorney to the other did not reflect a "meeting of the minds." 172 Ill. App. 3d 790, 798, 527 N.E.2d 146, 151 (1988). The letter referenced an earlier conversation about the settlement amount but no terms or conditions. When the court questioned the attorney about terms or conditions, the attorney admitted that all that was discussed was the amount. *Id*. The uncontroverted evidence in the present case establishes that the parties, through counsel, discussed a set amount of payment in exchange for a release of claim for coverage. That is a settlement agreement.

## IV.   Vita Food's Authority to Settle with Cincinnati

Plaintiffs argue that Vita Food did not have authority to settle with Cincinnati without Plaintiffs' consent or involvement. (Dkt. 37 at 20; Dkt. 48 at 16). Plaintiffs rely on one provision in the insurance policies to support this argument:

> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

(Wausau Policy, PSOF ¶26). The Employers Policy contains the same language (PSOF ¶27). Cincinnati responds that Plaintiffs were not necessary parties to its

settlement with Vita Food and there were no subrogation rights to be transferred at that time.

Indeed the plain language of the policies refer to Plaintiffs' rights to recover from the insured all or part of any payment "we *have made*." (PSOF ¶26) (emphasis added). Thus once Plaintiffs have paid, then the insured's rights are transferred to them. *See Stonegate Ins. Co. v. Hongsermeier*, 2017 IL App (1st) 151835, ¶ 16, 72 N.E.3d 869, 874 (2017) (clear words in an insurance policy given their plain and ordinary meaning and applied as written); *Bituminous Cas. Corp. v. Royal Ins. Co. of Am.*, 301 Ill. App. 3d 720, 727, 704 N.E.2d 74, 79 (1998) (transfer of rights clause "entitles the insurer to stand in the shoes of the insured to recover against a tortfeasor those amounts paid to or on behalf of an insured.").

On January 25, 2017 when Vita Food entered into the settlement agreement, Plaintiffs had not yet paid any judgment on behalf of Vita Food. Plaintiffs did not pay until end of February 2017. (Diericks Decl.). Not until late February 2017, after judgment was entered against Vita Food in the Underlying Action and Plaintiffs had paid the judgment, were Plaintiffs entitled to "request" that Vita Food "transfer those rights".

Plaintiffs rely on *Benge v. State Farm Mut. Auto. Ins. Co.,* 297 Ill. App. 3d 1062, 697 N.E.2d 914 (1998) where State Farm insured both the plaintiffs and defendants in the underlying actions. Despite that unique set of circumstances, the *Benge* court acknowledged, "[t]he [subrogation] provision in question stated that the plaintiffs' rights to recover passed to the defendant *when it paid* the plaintiffs' damages

pursuant to their own coverage." *Id*. at 1067 (emphasis added). "The language in the plaintiffs' insurance policies clearly stated that, if the defendant paid the plaintiffs for damages to their vehicles, it would obtain the plaintiffs' rights to recover against a third party." *Id*. at 920. The *Benge* court stressed: "[c]learly, an insurance carrier may not exercise its right to subrogation *until it has paid* the insured's damages under the policy giving rise to the subrogation rights." *Id*. (emphasis added). *Hanover Ins. Co. v. Brandt Constr. Co.*, 2012 U.S. Dist. LEXIS 26214, at *9 (C.D. Ill. Feb. 29, 2012), also cited by Plaintiffs, addressed whether the insured was a real party in interest to the lawsuit. The insurer had already made the payment to the insured and based on the circumstances in that case, the court found the insured was not a real party in interest. In this case, the question is not whether Vita Food is a real party in interest. Plaintiffs do not cite any authority to support the proposition that the transfer of rights provision in the insurance policies prohibited their insured, Vita Food, from entering into a settlement agreement with Cincinnati before Plaintiffs had made any payment on behalf of Vita Food.

Cincinnati and Vita Food entered a settlement agreement on January 25, 2017. Plaintiffs have failed to raise a genuine issue of fact about the existence of that agreement. Thus Cincinnati's fifth affirmative defense bars Plaintiffs' claims in this case.

## CONCLUSION

For the stated reasons, Plaintiffs' motion for summary judgment [36] is denied and Cincinnati's motion for summary judgment [43] is granted. Judgment is entered in favor of Defendant Cincinnati. Civil case terminated.

E N T E R:

Dated: May 5, 2020

_____
MARY M. ROWLAND
United States District Judge